COURT OF APPEALS DIV 1
2013 NOV 18 AM 8: 51



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68854-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| PATRICK CARL TURK, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 18, 2013 |

SCHINDLER, J. — A jury convicted Patrick Carl Turk of theft of a motor vehicle and attempted theft of a motor vehicle. Turk seeks reversal of his convictions, arguing insufficient evidence supports the convictions. We affirm.

FACTS

In the evening of September 15, 2010, a man, later identified as Patrick Carl Turk, knocked on Lyle Schadee's front door. Turk told Schadee that he "collected scrap iron as a job" and asked Schadee if he "had any scrap iron laying around, any used barbecues or anything . . . that he could collect and, you know, take and recycle." Schadee told Turk that he did not have any scrap metal, but that he would take Turk's name and phone number and give him a call later if he had any. Turk then asked Schadee about the tractor sitting in Schadee's pasture. Schadee told Turk that he was storing the tractor for his friend Nathan Udd, and that it was "not [his] to talk about or

give away or sell."

On the afternoon of September 17, Schadee's neighbor Wally Grunstad noticed a pickup truck with an attached car trailer drive onto Schadee's property and, a short while later, drive away with a tractor on it. Grunstad saw Schadee's son Blake wave at the truck as it passed him on the road.

Blake said that he was walking home from school when he saw the truck pulling out of the driveway with the tractor loaded onto the trailer. Blake called his father to ask if Udd had picked up his tractor. Because Blake's description of the truck matched the pickup truck that Turk was driving when he stopped and talked to Schadee a few days earlier, Schadee called 911 to report the theft.

Robert Morrison owned a skid loader tractor that he kept in front of the barn on his property. On September 18, Morrison's neighbor Michael Canfield was working outside on his property when a pickup truck stopped. Turk and another man got out of the truck and approached Canfield. Turk told Canfield that he "had a letter from the owner [of the skid loader] that he could come and pick [the skid loader] up." Canfield was suspicious because in the past Morrison had "always escorted people onto his property if they were there to pick something up." Canfield asked Turk the name of the skid loader owner. After Turk gave him a different name than Morrison, Canfield told his wife to go inside the house and call "the real owner." Canfield told Turk, "I don't know whose name you have, but that's not the owner of the property." Turk and the other man then got back into the truck and drove away.

On September 20, Canfield noticed the same truck parked across the street from Morrison's property and called 911. When Turk saw Canfield he "tore off" in the pickup

truck.

The State charged Turk with the theft of Udd's Farmall Tractor and the attempted theft of Morrison's skid loader tractor.

The State called a number of witnesses at trial, including Schadee, Grunstad, Canfield, Udd, and Morrison. Udd testified that he inherited the 1939 Farmall Tractor from his dad and that it was the tractor he first learned to use and ride. The tractor started by hand crank and did not require a key. Udd testified that he was storing the tractor on Schadee's property because he did not have room for it at his home. Udd said that after he drove the tractor onto Schadee's property, he "removed the fuel bowl off the lower part of the tank and drained the tank" so that there would be "[n]o way to get fuel to the engine."

Morrison testified that he had owned the skid loader tractor for "[t]en, eleven years" and previously used it in his trucking and excavating business. The skid loader sat on a trailer "for it to drive on, or to be pulled on." The court admitted into evidence two photos of the skid loader tractor. The photos show an older, slightly rusty vehicle, with some weeds growing out of it. Morrison testified that after the attempted theft, he had the skid loader tractor and trailer it was sitting on "hauled away" and "sold it for scrap."

At the conclusion of the State's case, the defense moved to dismiss the charges on the grounds that the State failed to show that "either of these devices are motor vehicles." The court denied the motion, ruling that there was a "sufficient quantum of evidence" to find that "the State has proved that there is in each count a motor vehicle."

> With regard to the 1939 International tractor, . . . [t]he owner of the tractor when asked if it could operate -- if it needed keys said, Well, no you

3

turn it by crank, but it couldn't be driven because he had taken the fuel bowl off. Which the jury could certainly find that it was at most temporarily inoperable because of steps that the owner had taken that it couldn't be driven.

So a reasonable fact finder could quite easily find beyond a reasonable doubt that . . . it's a motor vehicle.

With regard to Count II it's a closer question, but the State's argument prevails. The definition of a motor vehicle is, "Motor vehicle means every vehicle that is self propelled, and every vehicle that is propelled by electric power obtained from overhead trolley wires but not operated upon rails."

Vehicle is defined as, "Vehicle includes every device capable of being moved upon a public highway."

This device is capable of being moved upon a public highway. It's certainly designed to be able to move upon a public highway. It's not, perhaps, designed primarily for use upon a public highway, but that begs the question.

. . . .

The fact that it is inoperable at the time that -- it's arguably inoperable at the time that it was found, I think the testimony was that it might move, but only until the bottom track ran out. And I suppose at that point it could still move in circles.

But the question is whether it's capable of moving upon a public highway, and that's a question for the jury. There's a sufficient quantum of evidence with regard to both counts as to whether the items in question are motor vehicles. The motion is denied.

Turk testified and denied taking the tractor and attempting to take the skid loader.

Turk said that while he was driving around looking for scrap he remembered seeing "an old lawn mower, . . . tractor parts, . . . a lot of it was all growed up with sticker bushes" on Schadee's property. Turk stopped and asked Schadee if he could haul away the scrap. After Schadee said that he would give Turk a call when he had gathered up his scrap, Turk testified that he left and never returned to take any scrap from the property.

Turk testified that he remembered spotting the skid loader tractor on Morrison's property and remembered asking Canfield about it. But Turk denied telling Canfield he had permission of the owner to take the skid loader away. Turk also testified that when

4

Canfield saw him on September 20, he was parked near Morrison's property because his truck had run out of gas.

The to-convict jury instruction for theft of a motor vehicle states, in pertinent part, that each of the following elements must be proven beyond a reasonable doubt:

 (1) That on or about the 17th day of September, 2010, the defendant wrongfully obtained or exerted unauthorized control over a motor vehicle; and

 (2) That the defendant intended to deprive the other person of the motor vehicle.

The to-convict jury instruction for attempted theft of a motor vehicle states, in pertinent part, that each of the following elements must be proven beyond a reasonable doubt:

 (1) That on or about the 18th day of September, 2010, the defendant did an act that was a substantial step toward the commission of theft of a motor vehicle; [and]

 (2) That the act was done with the intent to commit theft of a motor vehicle.

The jury instructions defined "motor vehicle" as "every vehicle that is self-propelled and every vehicle that is propelled by electric power obtained from overhead trolley wires, but not operated upon rails." The jury instructions defined "vehicle" as "every device capable of being moved upon a public highway and in, upon, or by which any persons or property is or may be transported or drawn upon a public highway, including bicycles."

The jury convicted Turk as charged of theft of a motor vehicle and attempted theft of a motor vehicle. The court imposed a standard-range sentence of 24 months.

## ANALYSIS

Turk contends he is entitled to dismissal because insufficient evidence supports

the convictions of the theft of Udd's tractor and the attempted theft of Morrison's skid loader tractor. Specifically, Turk argues that insufficient evidence supports finding the inoperable tractors were motor vehicles.

The State must prove each essential element of the crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Oster, 147 Wn.2d 141, 146, 52 P.3d 26 (2002). In deciding whether sufficient evidence supports a conviction, we must view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Salinas, 119 Wn.2d at 201. "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Turk argues that because "motor vehicle" is defined as a vehicle that is "self-propelled," the State had the burden of proving beyond a reasonable doubt that the tractors were operable at the time of the theft and attempted theft. State v. McGary, 37 Wn. App. 856, 683 P.2d 1125 (1984), is dispositive.

In McGary, the defendant McGary challenged the sufficiency of the evidence to support his conviction for taking a motor vehicle without permission. McGary, 37 Wn.

6

App. at 857. McGary argued that because the motorcycle was inoperable, the State failed to prove he took a motor vehicle. McGary, 37 Wn. App. at 857. The court rejected McGary's argument.

Because Washington's Criminal Code does not define "motor vehicle," the court looked to the definitions provided in Title 46 RCW dealing with motor vehicles, noting that former RCW 46.04.320 (1961) defined a "motor vehicle" as "every vehicle which is self-propelled."[1] McGary, 37 Wn. App. at 858. The court also looked to the definition of "vehicle" in former RCW 46.04.670 (1979), and adopted the rationale of Parnell v. State, 261 S.E.2d 481, 482 (Ga. Ct. App. 1979). Former RCW 46.04.670 defined "vehicle" as including "every device capable of being moved upon a public highway . . . excepting devices moved by human or animal power."[2] McGary, 37 Wn. App. at 858. The court held that for purposes of the criminal code, the definition of "motor vehicle" is concerned with the " 'design, mechanism, and construction of the vehicle rather than with its temporary condition.' " McGary, 37 Wn. App. at 859 (quoting Parnell, 261 S.E.2d at 482). The court held that the inoperable motorcycle "remained a motor vehicle within the meaning of the statute." McGary, 37 Wn. App. at 859.

> [T]he definition of a "motor vehicle" in terms of a self-propelled vehicle is "concerned with the design, mechanism, and construction of the vehicle rather than with its temporary condition, and a motor vehicle does not cease to be such merely because it is temporarily incapable of self-propulsion."

McGary, 37 Wn. App. at 859 (quoting Parnell, 261 S.E.2d at 482).

---

[1] The relevant statute here, former RCW 46.04.320 (2010), defines a "motor vehicle," in pertinent part, as "every vehicle that is self-propelled and every vehicle that is propelled by electric power obtained from overhead trolley wires, but not operated upon rails."

[2] The relevant statute here, former RCW 46.04.670 (2010), defines "vehicle," in pertinent part, as including "every device capable of being moved upon a public highway and in, upon, or by which any persons or property is or may be transported or drawn upon a public highway, including bicycles," but not "power wheelchairs or devices other than bicycles moved by human or animal power or used exclusively upon stationary rails or tracks."

In a recent case, State v. Acevedo, 159 Wn. App. 221, 248 P.3d 526 (2010), we reiterated that the State does not have the burden of proving that a vehicle is self-propelled or operable at the time of the offense for it to be a motor vehicle. Acevedo, 159 Wn. App. at 229.

In Acevedo, the State charged the defendant Acevedo with possession of a stolen vehicle. The stolen vehicle was a "1998 Acura with no front end, engine, or transmission." Acevedo, 159 Wn. App. at 225. When police recovered the car from Acevedo's property it "had no motor, transmission, wheels, or tires." Acevedo, 159 Wn. App. at 225. At trial, Acevedo argued that "he possessed a bunch of automobile parts, not a motor vehicle," and that he could not be guilty of possession of a stolen vehicle because the Acura was not operable. Acevedo, 159 Wn. App. at 225. Citing McGary, we concluded that "a motor vehicle falls under the heading of self-propelled even if it is currently incapable of self-propulsion," and held that the State did not have to prove the vehicle was capable of self-propulsion when Acevedo possessed it. Acevedo, 159 Wn. App. at 228-29.

Since the decision in McGary in 1984, the legislature has amended the statute five different times but has not amended the definition of "self-propelled." LAWS OF 2010, ch. 217, § 1; LAWS OF 2007, ch. 510, § 1; LAWS OF 2003, ch. 353, § 1; LAWS OF 2003, ch. 141, § 2; LAWS OF 2002, ch. 247, § 2. When amending a statute, the legislature is presumed to know how the courts have construed and applied the statute. In re Pers. Restraint of Quackenbush, 142 Wn.2d 928, 936, 16 P.3d 638 (2001).

Further, courts in other states have uniformly held that the term "self-propelled" is concerned with the design of the motor vehicle rather than a temporary condition. See,

8

e.g., Parnell, 261 S.E.2d at 482; People v. Matusik, 234 N.W.2d 517, 519 (Mich. Ct. App. 1975); State v. Ridinger, 266 S.W.2d 626, 631 (Mo. 1954); Rogers v. State, 183 S.W.2d 572, 572 (Tex. Crim. App. 1944); Asay v. Watkins, 751 P.2d 1135, 1137 (Utah 1988); State v. Tacey, 150 A. 68, 69 (Vt. 1930).

Viewed in the light most favorable to the State, sufficient evidence supports the conclusion that the Farmall Tractor Turk stole and the skid loader tractor he attempted to steal were motor vehicles. Both Udd and Morrison testified that the tractors were, at one point, self-propelled, and there was no evidence presented that the vehicles could not be made operable. Udd explained that the tractor was not operational at the time Turk stole it because he had taken the fuel bowl off, but there was nothing to suggest that it was anything other than temporarily inoperable. Morrison testified that he used his skid loader tractor in his trucking and excavating business and no evidence was presented that it was not capable of being made operable.

We affirm.

WE CONCUR:

9